# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 17-1906V
UNPUBLISHED

|  |  |
|---|---|
| JEANNE RAFFERTY,<br><br>               Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>             Respondent. | Chief Special Master Corcoran<br><br>Filed: May 21, 2020<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Summer Pope Abel, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.*

*Linda Sara Renzi, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

On December 8, 2017, Jeanne Rafferty filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a Shoulder Injury Related to Vaccine Administration ("SIRVA") caused in fact by the influenza ("flu") vaccine she received on October 17, 2016. Petition at 1, ¶¶ 1, 4, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount **$131,654.04**, **representing $127,500.00 for past pain and suffering, and $4,154.04 for past unreimbursed expenses.** Petitioner is not, however, entitled to compensation for *future* pain and suffering.

## I.      Relevant Procedural History

Shortly after filing her petition, Ms. Rafferty filed her medical records and affidavit. Exhibits 1-9, filed Dec. 21, 2017, ECF No. 7; Statement of Completion, filed Dec. 21, 2017, ECF No. 8. Approximately one month later, she filed documentation regarding the past revisions to her vaccine record and her requests to have the record further edited. Exhibit 10, ECF No. 10.

Following the initial status conference, Respondent was ordered to file a status report indicating his tentative position regarding the merits of Petitioner's case. ECF No. 11. Instead, Respondent filed a motion to dismiss Petitioner's case, arguing Petitioner had failed to provide sufficient evidence to establish she received the vaccine alleged as causal in her right injured arm. ECF No. 12. Petitioner filed a response on April 19, 2018, asserting she had provided sufficient evidence to establish she was entitled to compensation, and urging former Chief Special Master Dorsey to whom the case was assigned at the time[3] "to issue a decision finding that [she] received the vaccination in her right arm, and [wa]s therefore entitled to vaccine compensation." Petitioner's Response to Respondent's Motion to Dismiss at 10, ECF No. 13.

Chief Special Master Dorsey declined to rule on entitlement, but found there was preponderant evidence sufficient to establish Petitioner received the flu vaccine in her right injured arm, and that onset of Petitioner's pain occurred within 48 hours of vaccination. Findings of Fact and Conclusions of Law ("Fact Ruling"), at 2, ECF No.15. She denied Respondent's motion to dismiss and instructed the parties to engage in settlement discussions. *Id.* at 13-14.

On November 9, 2018, Petitioner filed a status report indicating she had submitted a demand and supporting documentation to Respondent. ECF No. 16. On March 18, 2019,[4] Respondent filed a status report indicating he expected to respond to Petitioner's demand by April 8, 2019 and requesting to file a Rule 4 report by April 17, 2019. ECF No.

---

[3] I was appointed Chief Special Master on October 1, 2019. This case was reassigned to me that same day.

[4] The parties' settlement discussions were interrupted by the unavailability of Respondent's counsel during the partial government shutdown from late December 2018 through late January 2019. *See* General Orders, filed on Dec. 26, 2018 and Jan. 29, 2019, which can be found on the court's website.

21. Respondent filed his Rule 4 report as expected, and a ruling on entitlement was issued on April 19, 2019. ECF Nos. 23-24.

Over the subsequent eight months, the parties attempted to informally agree upon the appropriate amount of damages in this case. On May 20, 2019, Petitioner indicated that she had not yet received a response to her demand, submitted on November 9, 2018. ECF No. 26. On June 20, 2019, she filed the results of a test ordered on January 11, 2017, and medical records from the WellFit Program Petitioner attended following formal PT in July 2017 through mid-September 2017. Exhibits 11-12, ECF No. 28. A call with the parties was held on August 12, 2019. On September 3, 2019, Respondent provided a counter offer regarding the amount of compensation sought for Petitioner's pain and suffering and requested additional documentation to support the amount of past unreimburseable expenses sought. ECF No. 36.

In November and December 2019, the parties exchanged further counteroffers, and Petitioner provided the additional documentation requested by Respondent. Status Report at 1, ECF No. 42. On December 30, 2019, Petitioner indicated that, despite the parties' efforts, they had reached an impasse in their discussions. *Id.* She provided an agreed upon schedule for briefing by the parties. *Id.* at 1-2. Petitioner subsequently submitted her damages brief and updated medical records on February 21, 2020. Petitioner's Brief on Damages ("Pet. Brief"), ECF No. 45; Exhibits 13-17, ECF No. 44. Two months later, Respondent filed his response. Respondent's Brief on Damages ("Res. Brief"), filed Apr. 20, 2020, ECF No. 47. On May 12, 2020, Petitioner filed her reply. Petitioner's Reply to Respondent's Brief on Damages ("Pet. Reply"), ECF No. 48.

## II.   Relevant Medical History

### A.  Medical Records

The medical records from Petitioner's primary care provider ("PCP"), Dr. Wah, at Carroll Health Group, show that Petitioner underwent several surgeries after falling on ice in 2006.[5] On August 19, 2014, she was assessed with chronic back pain and leg weakness. Exhibit 2 at 19. Petitioner continued to suffer chronic back and hip pain and weakness in her lower extremities during the subsequent two-year period.[6] On

---

[5] Exhibit 2 at 18-20 (summary from visit on Aug. 19, 2014). The record of that visit provides a history of Petitioner's surgeries in 2006 and 2008 and complications during a procedure in 2010. *Id.* at 18.

[6] On September 24, 2014, Petitioner complained of left hip pain. Exhibit 2 at 15. Her continued back pain was also mentioned in that record. *Id.* An x-ray of Petitioner's left hip, the results of which were normal, was performed on October 6, 2014. *Id.* at 30. On November 20, 2015, it was noted that Petitioner had slightly less strength in her lower right extremities. *Id.* at 11.

September 24, 2014, Petitioner was prescribed one tablet of extra strength Tylenol three times a day. *Id.* at 16. As noted in the record from a June 2, 2015 visit, she also was taking 7.5 milligrams of Meloxicam[7] daily. *Id.* at 13. Her back pain was re-evaluated on June 22, 2016 (approximately four months prior to vaccination). *Id.* at 6. Petitioner was instructed to continue her current pain medication. *Id.* at 7. Petitioner's medical records from her PCP indicate she continued her prescriptions of extra strength Tylenol and Meloxicam at the levels originally prescribed. *Id.* at 10, 7, 3 (chronological order). There is, however, no mention of arm or shoulder pain in the medical records from prior to vaccination.

Petitioner received the flu vaccine on October 17, 2016. The vaccine record indicates the site of vaccination was initially identified as petitioner's left vastus lateralis (thigh),[8] but was edited to change the site of administration to Petitioner's left deltoid. Exhibit 2 at 5.[9] Multiple subsequent attempts by Petitioner to further correct the vaccine record to reflect her right deltoid as the site of vaccination were unsuccessful. *E.g.* Exhibit 10 (showing requests and denial). In her October 11, 2018 fact ruling, however, then-Chief Special Master Dorsey found the vaccine was more likely than not administered in Petitioner's right deltoid, as alleged. Fact Ruling at 2, 13, ECF No. 15.

On December 1, 2016, Petitioner returned to her PCP, complaining of right arm pain. Seen at this visit by Sandip S. Hirpara, D.O.,[10] she reported pain which had been "present since she received her Flu vaccine 5 weeks ago." Exhibit 2 at 3. Petitioner identified the injection site, which Dr. Hirpara noted was "tender to touch." *Id.* Describing her pain as extending to her elbow, Petitioner indicated that lifting her arm was "very painful." *Id.* She further indicated she had tried Motrin on a permanent basis. *Id.* While examining Petitioner, Dr. Hirpara observed minimal swelling, erythema,[11] and tenderness. Exhibit 2 at 4. He ordered an MRI and indicated that (depending on the results of the MRI) he would refer Petitioner to an orthopedist. *Id.*

---

[7] Meloxicam is "a nonsteroidal inflammatory drug used in the treatment of osteoarthritis; administered orally." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1126 (32nd ed. 2012).

[8] Vastus lateralis is the largest muscle in the quadriceps group, located on the side of the thigh. https://www.healthline.com/human-body-maps/vastus-lateralis-muscle (last visited on Apr. 23, 2020).

[9] In addition to the record contained in the medical records from Petitioner's PCP (Exhibit 2 at 5), the vaccination record was also filed as Exhibit 1.

[10] D.O. stands for Doctorate of Osteopathic Medicine. Unless a particular degree is specified the first time an individual is referenced, it is assumed any individual with the title of "Dr." has earned a Doctor of Medicine (M.D.). Doctors who have earned a D.O. may have received different training but have similar privileges and responsibilities as doctors with an M.D.

[11] Erythema is "redness of the skin produced by congestion of the capillaries." DORLAND'S at 643.

MRIs of Petitioner's right humerus bone and shoulder were performed on December 6, 2016. Exhibit 4 at 1-2. The MRI of her right shoulder showed "[b]ursal sided partial tearing of the distal supraspinatus tendon with a background of mild tendinosis," "[m]ild tendinosis of the distal infraspinatus tendon," and mild osteoarthritis in the acromioclavicular (AC) and glenohumeral joints. *Id.* at 2.

On December 14, 2016, Petitioner saw an orthopedist at the Carroll Health Group, Dr. Rollo. Exhibit 6[12] at 5-7. At that visit, she reported two months of right shoulder/arm pain with onset after receiving the influenza vaccination. *Id.* at 5. Describing her pain as occurring throughout the day and worse when attempting to lift objects, Petitioner denied any numbness or tingling. *Id.* She further indicated that taking two Advil tablets at night "have not been helpful in controlling [her] symptoms." *Id.* Her prescriptions for extra strength Tylenol and Meloxicam were noted under current medications. Exhibit 6 at 6. Dr. Rollo reported that he observed "no swelling, deformity, or atrophy," tenderness at her biceps tendon upon palpitation, and an active range of motion ("ROM") to 140 degrees for abduction but with pain. *Id.* at 6. Noting bursal sided partial tearing of the supraspinatus[13] and arthritic changes revealed on Petitioner's December 2016 MRI, Dr. Rollo described the changes as "degenerative in nature changes and not related to the injection." Exhibit 6 at 6-7. He prescribed medication to include a prednisone[14] taper and physical therapy ("PT") to begin a few days later. Exhibit 6 at 7. Petitioner began formal PT at Wellspan Rehabilitation on December 28, 2016. Exhibit 7 at 71-72 (intake form).[15]

At her initial PT session on December 28, 2016, Petitioner described aching pain along the anterior part of her right shoulder traveling along her biceps to her elbow and into her hand. Exhibit 7 at 69. She rated the level of her pain as from 3 to 7 out of 10. Regarding her reduced function, Petitioner rated tasks such as lifting a gallon of milk out of the refrigerator as a 5 and tasks such as vacuuming and closing a car door as 4 on a scale of 0 to 10 with 10 meaning full function. Petitioner scored a 36 percent loss of function in the Quick Dash test. *Id.* Upon examination, it was noted that Petitioner exhibited "significant tenderness" with palpitation. *Id.* at 70. Her active ROM was assessed as 145 degrees for forward flexion and 120 degrees for abduction. *Id.*

---

[12] These records show that, in 2014, Petitioner was treated by another orthopedist at the Carroll Health Group, Dr. Blue, for pain in her left thigh. Exhibit 6 at 8-14.

[13] Dr. Rollo did not specify whether he was referring to the supraspinatus tendon or muscle. Given the results of the MRI, showing partial tearing of the tendon, it can be inferred that Dr. Rollo was referring to the supraspinatus tendon. Exhibit 4 at 2 (results of MRI).

[14] Prednisone is "a synthetic glucocorticoid derived from cortisone, administered orally as an anti-inflammatory and immunosuppressant in a wide variety of disorders." DORLAND'S at 1509.

[15] On her intake form, Petitioner listed "flu shot administration" as the cause of her injury and dated the injury as occurring on October 17, 2016. Exhibit 7 at 71. Petitioner included information about her earlier neck and back injury on the intake form. *Id.*

Petitioner attended seven more PT sessions in January 2017. Exhibit 7 at 61-67. At these sessions, she reported the following pain levels: 6-7, 4-5, 6-6.5, 7-8, 6-7, 5-6, and 5. On January 21, 2017, she indicated that the over the counter anti-inflammatory medication she was taking was not helping and that her pain seemed to be at the level it was before she gained some relief from the prednisone. *Id.* at 64. When she reported slightly lower pain levels, Petitioner usually attributed the improvement to a lack of activity. *Id.* at 66.

Petitioner followed up with Dr. Rollo regarding her right shoulder pain on January 11, 2017. Exhibit 6 at 2. She reported that her pain had improved by 50 percent while on steroids but returned when the medication was completed. In addition to the extra strength Tylenol and Meloxicam she had been taking since late 2014, Petitioner's current medications included 10 milligrams of prednisone daily. Describing her pain as located in the front of her shoulder and radiating downwards to her elbow, Petitioner also complained of stiffness and coldness, but no numbness or tingling, in her hand. *Id.*

Dr. Rollo observed that Petitioner's ROM was further limited, to 80 degrees. Acknowledging that he "initially did not believe the needles were long enough to cause any mechanical damage to the underlying RTC [(rotator cuff)]," Dr. Rollo indicated that, after further research, he could not "confirm or deny the injection as a cause of [petitioner's] discomfort." Exhibit 6 at 2. Having become aware of studies showing infiltration of the bursa is possible in thin women, Dr. Rollo admitted he was "uncertain of the potential side effects of the vaccine itself." *Id.* He instructed Petitioner to continue her daily dose prednisone and PT. *Id.* at 3. Directing Petitioner to return in one month for a re-evaluation, Dr. Rollo added that a steroid injection should be considered if Petitioner continued to experience pain. *Id.*

During Petitioner's PT reassessment on February 4, 2017, Petitioner "report[ed] that she ha[d]not really noticed any changes or improvement since starting physical therapy." Exhibit 7 at 57. Describing her pain as "up and down depending on her activity," Petitioner indicated that "she d[id] have decreased pain with rest and [wa]s no longer in pain all the time." *Id.* However, she also indicated that, after receiving some relief while taking prednisone, her pain had returned "just as bad if not worse than before." *Id.* While acknowledging some improvement with certain task (getting milk out of the refrigerator) (*id.*), Petitioner reported that she had not done much in the last few days since her husband was home (*id.* at 60). At this reassessment, Petitioner showed a further decrease in her active ROM, exhibiting forward flexion of 117 degrees, abduction of 106 degrees, and external rotation of 42 degrees. *Id.* at 57. She rated the level of her pain as 6 out of 10. *Id.* at 60. It was determined that Petitioner should attend additional PT twice week for four weeks. *Id.* at 58.

On February 7, 2017, Petitioner sought a second opinion from Dr. Bischoff at Wellspan Hanover Orthopaedics. *See* Exhibit 3 at 10-11 (record from that visit)*;* Exhibit 7 at 56 (discharge record from PT indicating Petitioner's visit to Dr. Bischoff was for a second opinion). At the initial visit to Dr. Bischoff, Petitioner provided a detailed history. Exhibit 3 at 10. She again described significant right shoulder pain, extending to her elbow, which began after she received the influenza vaccination on October 17, 2016. Indicating that "the injection was given high, . . . [Petitioner] point[ed] to the region just underneath her acromion laterally" which she stated occasionally felt swollen. *Id.* Although that area of her right shoulder "ached significantly for the next 2 weeks" following vaccination, Petitioner recounted that she did not seek medical care earlier due to the death of a friend. *Id.*

Dr. Biscoff reported at this time that "[o]n examination of [Petitioner's] right shoulder, once again, she points just inferior to the lateral ledge of the acromion, as to where the injection was given." Exhibit 3 at 10. While indicating he could not "appreciate any significant swelling about the shoulder, [and] [t]here is no erthythema or warmth," Dr. Bischoff did observe "mild tenderness to the palpitation about the shoulder girth itself," adding that it was non-specific. *Id.* He reported Petitioner "gets significant pain when she tries active range of motion." *Id.* Regarding her ROM, he observed that Petitioner could forward flex and abduct to 100 degrees with effort, could externally rotate to 40 degrees, and could internally rotate to L1. Her rotator cuff strength was reported to be a 4 out of 5. *Id.*

Reviewing the MRI of Petitioner's right shoulder, Dr. Biscoff noted that her "rotator cuff tendons appear to be intact, [t]here may be some evidence of a tendinopathy, . . . "mild effusion within the soft tissues, . . . [and] some subacromial spurring and AC joint arthritis." Exhibit 3 at 10. He opined that the cause of Petitioner's right shoulder pain was the influenza vaccination she received, adding that, although rare, SIRVA is "described in the literature." *Id.* He discussed options such as a steroid injection or arthroscopic surgery, prescribed an additional tapering dose of prednisone, and instructed Petitioner to stop PT. *Id.*; *see also* Exhibit 7 at 56 (describing Petitioner's discharge from PT upon the recommendation of Dr. Bischoff, after attending eight sessions).

On March 1, 2017, Petitioner visited Dr. Bischoff for a pre-operative physical, having "elected to proceed with the right shoulder arthroscopy." Exhibit 3 at 8. In the record from that visit, it is noted that Petitioner "once again describe[d] the pain as being instantaneous at the time of the injection and it has not improved with time." *Id.* Dr. Bischoff observed the same ROM and rotator cuff strength as seen at the prior visit, on February 7, 2017. He described the planned surgery as "arthroscopic irrigation and

debridement of the subacromial space," possibly including an acromioplasty.[16] Exhibit 3 at 8.

Arthroscopic surgery on Petitioner's right shoulder was performed by Dr. Bischoff on March 15, 2017. Exhibit 3 at 13-14; *see also* Exhibit 5 (records from Hanover Hospital where the surgery was performed). According to Dr. Bischoff's records, general anesthesia was administered. Exhibit 3 at 13. Dr. Bischoff then created several portals but elected not to enter the joint itself to avoid introducing any irritants. He observed the bursa to be enlarged[17] and hyperemic.[18] Exhibit 3 at 13. Performing a bursectomy, Dr. Bischoff used a shaver to debride the bursa, undersurface of the acromion, and coracoacromial ligament. *Id.* at 13-14. An acromioplasty was not performed, but Dr. Bischoff debrided further in the subdeltoid interval. *Id.* at 14. He observed no evidence of a rotator cuff tear. *Id.*

Petitioner returned to Wellspan Rehabilitation for her post-surgery PT on March 17, 2017. Exhibit 7 at 50-51 (plan of care from Dr. Bischoff), 52-53 (initial evaluation by physical therapist). Describing her pain as an ache in her right anterior shoulder into her biceps with intermittent sharp pains and some numbness and tingling, Petitioner rated its level from 0 to 9 on a scale of 10. *Id.* at 52. Upon examination, Petitioner exhibited right shoulder flexion to 35 degrees, abduction to 25 degrees, and external rotation to 3 degrees, all with pain and muscle guarding. *Id.* at 53. In contrast, Petitioner showed flexion to 150 degrees, abduction to 138 degrees in her left uninjured arm. *Id.* It was noted that Petitioner had been instructed to keep her injured right arm, noted to be her dominant arm, in a sling until seen by her orthopedist on March 21, 2017. *Id.* at 52.

At her March 21, 2017 visit with Dr. Bischoff, Petitioner indicated she had experienced post-operative dizziness and nausea which improved after she reduced her pain medication. Exhibit 3 at 6. She reported some soreness but added that it was not extensive and was different than what she had experienced prior to her surgery. It was noted that Petitioner would return in 3 days to have her sutures and "may start using her right arm for light activities of daily living." *Id.*

At her next orthopedic visit, on March 24, 2017, Petitioner reported that "she has been working on [her] passive range of motion at therapy with good results." Exhibit 3 at

---

[16] Acromioplasty is the "surgical removal of an anterior spur of the acromion to relieve mechanical compression of the rotator cuff during movement of the glenohumeral joint." DORLAND'S at 20.

[17] Dr. Bischoff noted that Petitioner had "an abundant amount of hypertrophic bursa." Exhibit 3 at 13. Hypertrophic is the adjective form of hypertrophy, "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." DORLAND'S at 898.

[18] Hyperemic is the adjectival form of hyperemia, "an increase of blood in a part." DORLAND'S at 888.

4. She reported little shoulder pain which she "tolerated well with over-the-counter anti-inflammatories." *Id.* Upon examination, Petitioner showed forward flexion to 100 degrees, external rotation to 40 degrees, and internal rotation to L1. She was instructed to continue her PT and to return for a follow-up appointment in four weeks. *Id.*

She returned to see Dr. Bischoff on April 25, 2017. Exhibit 3 at 2. At this visit, she reported some soreness along the lateral side of her right shoulder. She indicated that she "has been going to therapy, but they have not really been pushing her too hard with range of motion or strengthening." *Id.* Dr. Bischoff observed active forward flexion and abduction to 110 degrees, and to 160 degrees passively with his help. Her external rotation was recorded as 30 degrees actively and 60 degrees passively. Petitioner was instructed to continue with her PT and home exercises and to return in six weeks. *Id.*

From March 17 through May 30, 2017, Petitioner attended 21 PT sessions. Exhibit 7 at 8-9, 21-23. During this time, she reported 60-70 percent improvement which included an "increased tolerance for reaching and lifting light objects due to increased strength," an ability to perform more childcare tasks such as getting her four-year old twins in and out of their car seats, and an increased ease when grooming her hair, dressing, and bathing. *Id.* at 21. In numeric values, Petitioner's abilities to perform these tasks had improved from 3, 0, 0 to 8s across the board. *Id.* at 5. As of May 17, 2017, Petitioner's disability score had improved from 88.64 to 38.64 percent. *Id.* At her last PT appointment on May 30, 2017, Petitioner exhibited active ROM for flexion to 145 degrees, abduction to 132 degrees, external rotation to 70 degrees, and internal rotation to L3. However, Petitioner continued to have difficulty sleeping for more than four hours. *Id.* at 21-22.

Petitioner visited Dr. Bischoff again on June 6, 2017. Exhibit 3 at 16. At that visit, it was noted that she had finished PT and was in the WellFit Program. Petitioner reported that she was feeling better but still experienced "some aching anteriorly and laterally." *Id.* Dr. Bischoff observed that Petitioner still had some symptomatology but was slowly improving. He indicated Petitioner should continue with her home exercise program ("HEP") and the WellFit Program and return for a follow-up appointment in two months. *Id.*

The medical records from WellFit Program indicate it "is a medically supported and guided exercise program for individuals in good health or who have unique medical needs." Exhibit 12 at 1. The WellFit website indicates it "is a medically guided self-pay exercise program for individuals striving to improve their overall fitness or wellness." *See* https://www.wellspan.org/programs/sports-medicine/wellfit-and-injury-prevention-services (last visited Apr. 25, 2020). It appears Petitioner attended Assisted WellFit programs of twice weekly sessions for four weeks three times in June through September 2017 at a cost of $50 per each 4-week session. Exhibit 12 at 1, 3-7. These exercise

sessions were conducted one on one by a certified athletic trainer, Meghan Clarkson, ATC.[19] Exhibit 12 at 3-7. Petitioner attended her last WellFit session on September 15, 2017. *Id.* at 7.

During an appointment with Dr. Bischoff on August 21, 2017, Petitioner indicated that she "had noticed some improvement over the last month" and was almost done with the WellFit Program. Exhibit 3 at 17. Upon examination, Petitioner's active ROM had improved to 160 degrees for forward flexion and abduction. Her external rotation was to 50 degrees and internal rotation to L1. Her rotator cuff strength was noted to be 5- out of 5. Dr. Bischoff instructed Petitioner to continue her HEP and to be careful with any heavy lifting or twisting activities over the next few months. *Id.* He indicted she should return only as needed. *Id.*

On September 20, 2017, Petitioner visited Wellspan Family Medicine to establish new patient care. Exhibit 8 at 2. Her recent shoulder surgery was included in Petitioner's history, but no ongoing symptoms were noted. *Id.* at 2-5. Petitioner filed no further medical records from Wellspan Family Medicine or any other PCP.

The only medical record Petitioner has filed from medical treatment from this point until the present is from a visit to Dr. Bischoff on October 2, 2019. Exhibit 13 at 1. In this record, Dr. Bischoff indicated that he had discharged Petitioner in August 2017. He characterized the October 2, 2019 visit as a "recheck". *Id.* At this visit, Petitioner reported some occasional soreness anteriorly, some residual stiffness, and that "[c]ertain activities bother her when she goes to the gym." *Id.* Her active ROM was observed to be "150 degrees of forward flexion; 50 degrees [of] external rotation; [and] internal rotation to L2." *Id.* at 2. Her rotator cuff strength was assessed as 5- out of 5. Dr. Bischoff attributed the soreness and stiffness Petitioner was experiencing to scar tissue from her surgery. He opined that Petitioner "more than likely has reached maximal medical improvement" and that he "d[id] not believe that any further treatment is warranted." *Id.* He advised Petitioner to continue her HEP and return as needed. *Id.*

### B. Petitioner's Affidavit and Other Documents

In her first affidavit, which was signed and notarized on December 15, 2017, Petitioner addresses the onset of her injury, the difficulties it has caused her, and her attempts to amend the vaccination record to reflect vaccine administration in her right, rather than left, arm. Exhibit 9. She provided documents which describe her efforts to amend the vaccination record and the responses she received. Exhibit 10.

---

[19] ATC stands for Athletic Trainer, Certified. MEDICAL ABBREVIATIONS at 71 (16th ed. 2020).

Regarding onset, Petitioner alleged that she "immediately experienced severe pain in [her] shoulder which was different than any other vaccine [she] had previously received." Exhibit 9 at ¶ 1. Indicating she had her three-year-old son with her, petitioner maintained she did not say anything about her pain because she did not want to frighten her son and "assumed it would feel fine in a short time." *Id.* Petitioner reports being unable to open the car door with her right arm after leaving the clinic. Petitioner indicates, rather than subsiding, her "shoulder and arm pain worsened to the point that [she] could no longer lift a cup of tea to [her] mouth with [her] right hand." *Id.*

Petitioner describes the effects of her right shoulder injury over the subsequent year. Exhibit 9 at ¶¶ 2-4, 6. A mother of twin three-year-old sons, one of whom has autism, Petitioner contends she was unable to care for her sons or herself and was forced to rely on her husband, mother, sister-in-law, and neighbor for help. *Id.* at ¶¶ 2-4. Petitioner describes difficulty brushing her teeth, dressing, and washing her hair. *Id.* at ¶ 4. In addition to the physical difficulties she experienced, Petitioner claims she and her family suffered emotionally. *Id.* She credits the second orthopedist she saw, Dr. Bischoff, for "the improvement and relief [she has experienced] thus far." *Id.* at ¶ 6.

Petitioner addresses her current condition more fully in her supplemental affidavit executed in February 2020. Exhibit 16. Petitioner maintains that she continues to experience intermittent pain, especially with certain movements, that she continues to perform her home exercises but is unable to regularly do so, and that she has had to modify the way she performs certain household tasks. *Id.* at ¶ 1. She claims that it took several years for both of her twin sons to adapt to the effects of her injury, longer for her son with autism. *Id.* at ¶ 2. She describes the effect her inability to hug her autistic son or drive him to his therapies had on his treatment. *Id.* ¶¶ 2-3. She lists some of the financial effects she suffered due to her injury. *Id.* at ¶ 4.

To support her assertions, Ms. Rafferty filed affidavits from her adult daughter and husband and a list of costs for which she seeks compensation. Exhibits 14-15, 17. The affidavits from her daughter and husband support Petitioner's description of the difficulties she experienced prior to and during her recovery from her March 2017 surgery, but do not address her condition following her post surgery PT. Exhibits 14-15. Her daughter discusses in detail the difficulties her mother experienced caring for her brothers during the five months prior to her surgery. Exhibit 14 at ¶¶ 1-3. Both she and her father indicate he had to take off work for the week after Petitioner's surgery. Exhibit 14 at ¶ 4; Exhibit 15 at ¶ 5. In his affidavit, Petitioner's husband provides details regarding the difficulties Petitioner faced during the six months following her surgery. Exhibit 15 at ¶ 5.

### III.    The Parties' Arguments

Petitioner seeks compensation in the amount of $179,154.04, representing $175,000.00 for her past pain and suffering and $4,154.04 for her past expenses, plus a yearly amount of $1,500.00 for her projected pain and suffering for the rest of her life. Pet. Brief at 1-2. While acknowledging that her condition improved post-surgery, Petitioner asserts that she "continues to have lingering pain that impacts her overall quality of life." *Id.* at 1. The compensation sought for Petitioner's expenses is the total of her out-of-pocket medical expenses. Exhibit 17, ECF No. 44-5.

To support the amount sought for her past pain and suffering, Petitioner stresses the intensity of the pain and limited ROM she suffered and the effect it had on her everyday activities. Pet. Brief at 11-12. Specifically, Petitioner details the difficulties she had caring for her twin three-year old sons, one of which has autism. *Id.* Petitioner admits that the majority of her pain and suffering occurred within the first year of her injury but maintains that she continues to suffer pain to this day. To support this assertion, she cites her recent appointment with Dr. Bischoff. *Id.* at 16.

Petitioner compares the facts in her case to those experienced by petitioners in other SPU cases, specifically in *Reed, Hooper,* and *Binette*.[20] Pet. Brief at 13-18. She argues that she should be awarded an amount of compensation for her past pain and suffering which is slightly more than that awarded in *Reed* ($160,000.00) and slightly less than that awarded in *Hooper* ($185,000.00). *Id.* at 16-17. She also maintains her pain and suffering was more extensive than that suffered by the petitioner in *Binette* (awarded $130,000.00 for past pain and suffering). *Id.* at 17.

Regarding compensation for her future pain and suffering, Petitioner argues she is entitled to more than that awarded in *Binette* ($1,000.00 per year). Pet. Brief at 18. Drawing similarities between her circumstances and those in *Hooper*, she insists she is entitled to the same amount of compensation as was award the *Hooper* petitioner ($1,500.00 per year). *Id.* To distinguish her case from *Reed,* in which a request for an award for future pain and suffering was denied, Petitioner compares the assessment

---

[20] *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); *Hooper v. Sec'y of Health & Human Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, and $37,921.48 for lost wages); *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses).

provided at her latest appointment with Dr. Bischoff to that given the petitioner in *Curri*,[21] a case discussed in *Reed* in which I was the special master and awarded $550.00 per year for future pain and suffering. Pet. Brief at 14.

Respondent contends Petitioner should be awarded no more than $105,000.00 for her pain and suffering. Res. Brief at 2. He does not, however, specify whether this amount is for past pain and suffering only or if a portion of the award would be for future pain and suffering. He adds that he has no objection to the amount Petitioner seeks for her outstanding medical expenses, $4,154.04. *Id.* at 2 n.4.

Respondent argues that Petitioner's "SIRVA was not severe." Res. Brief at 6. To support this assertion, he emphasizes Petitioner's delay in seeking treatment and results of her MRI. *Id.* at 6-7. He compares the injury Petitioner sustained with those suffered by the petitioners in the *Young* and *Selling*[22] cases, maintaining that the facts in Petitioner's case are most similar to those in *Selling* (in which $105,000.00 was awarded for actual pain and suffering). *Id.* at 8-9. He argues that "Petitioner's attempt to compare the severity of this case to cases [with] much higher awards is simply not supported by the evidence." *Id.* at 9.

Citing amounts awarded in civil actions for shoulder injuries outside of the Vaccine Program, Respondent asserts that awards in the Vaccine Program are substantially higher than other awards in the traditional tort system. Res. Brief at 7-8. He partially blames what he terms the "meeting-in-the-middle" method which he asserts is being used to decide awards when parties are unable to reach an informal agreement. *Id.* at 10. He argues that petitioners are inflating the amounts they are requesting while Respondent is forced to adhere to the amounts proffered during informal discussions. Because petitioners have consistently been awarded more than the amount advanced by Respondent, he argues petitioners are incentivized to request ever greater amounts.

In her reply, Petitioner characterizes her SIRVA as severe and repeats her assertion of continued pain since receiving the flu vaccine in October 2016. Pet. Reply at 2-4. Petitioner claims to have "suffered excruciating pain and significant limitations in her range of motion from the time of her vaccination." *Id.* at 3. She also argues that her "SIRVA was both severe and long lasting." *Id.* at 4.

---

[21] *Curri v. Sec'y of Health & Human Servs.*, No. 17-432V, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018) (awarding $120,000 for actual pain and suffering, $550.00 per year for a life expectancy of 28 years for projected pain and suffering, and $3,728.76 for projected expenses).

[22] *Young v. Sec'y of Health & Human Servs.*, No. 15-1241V, 2019 WL 396981 (Fed. CL. Spec. Mstr. Jan. 4, 2019 (awarding $100,000.00 for pain and suffering and $2,293.15 for expenses); *Selling v. Sec'y of Health & Human Servs.*, No. 16-0588V, 2019 WL 3425224 (Fed. Cl. Spec. Mstr. May 2, 2019) (awarding $105,000.00 for actual pain and suffering $9,505.82 for actual costs and expenses).

Regarding Respondent's citation of state court awards for shoulder injuries, Petitioner asserts that it would be inappropriate for me to consider the amount of those awards when determining the appropriate amount of compensation to be awarded in this vaccine case. Pet. Reply at 4-9. She proclaims that "[r]everence to state court verdicts is unprecedented in the Vaccine Program." *Id.* at 6. Stressing the intent of Congress and specialized nature of the Vaccine Program, Petitioner argues that the cases and awards cited by Respondent are not relevant to this inquiry. *Id.* at 8-9.

Comparing the facts in this case to those in other vaccine cases, Petitioner repeats her assertion that her injury is most like those suffered by the petitioner's in *Hooper, Reed,* and *Binette.* Pet. Reply at 11. She disputes Respondent's comparisons to the *Young* and *Selling* cases, pointing to specific differences in those cases. *Id.* at 10. Addressing Respondent's general argument regarding the amounts being awarded in the vaccine program, specifically those in SIRVA cases, Petitioner calls Respondent's argument disingenuous and insulting. *Id.* at 11-12.

## IV.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable[23] expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when

---

[23] "Unreimbursable" for Vaccine Act purposes means costs and expenses that are not otherwise subject to reimbursement to a petitioner from insurance or otherwise. *See* H.R. Rep. No. 99–908, at 20 (1986), 1986 U.S.C.C.A.N. 6344, 6361 ("[T]he Committee intends that the Program pay only demonstrated, actual costs for which reimbursement cannot be obtained.").

determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[24] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. In *Graves*, Judge Merrow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

---

[24] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### V.   Prior SIRVA Compensation

#### A. Overview of SIRVA Case Damages Outcomes in Settled Cases[25]

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2020, 1,405 SIRVA cases have informally resolved[26] since SPU's inception in July of 2014. Of those cases, 817 resolved via the Government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[27] Additionally, 567 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,044.86 to $122,038.99.[28] The median award is $95,000.00. Formerly, these awards were presented by the parties as a total agreed-upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Since late 2017, the government's proffer has included subtotals for each type of compensation awarded.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $92,500.00,[29] with a median award of $70,000.00. In most instances, the parties continue to present the stipulated award as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's

---

[25] I used the term "settled" broadly, to include both cases that the Department of Justice resolves via litigative risk discussions and those it proffers (meaning the Government represents that the damages sum accurately reflects its liability under the Act in the relevant case). Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims website by keyword and/or by special master. On the court's main page, click on "Opinions/Orders" to access the database. All figures included in this order are derived from a review of the decisions awarding damages within the SPU. All decisions reviewed are, or will be, available publicly.  All figures and calculations cited are approximate.

[26] Additionally, 41 claims alleging SIRVA have been dismissed within the SPU.

[27] There also have been 21 prior cases in which a petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[28] Typical range refers to cases between the first and third quartiles. Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00. Among the 21 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $115,772.83. For these awards, the first and third quartiles range from $90,000.00 to $160,502.39.

[29] Typical range refers to cases between the first and third quartiles. Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31. Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

## B. Specific Prior Reasoned Decisions Addressing SIRVA Damages

Additionally, since the inception of SPU in July 2014, there have been a number of reasoned decisions awarding damages in SPU SIRVA cases – meaning where the parties were unable to informally resolve damages, so the dispute was adjudicated and ruled upon by a special master. Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.

### i. Below-median awards limited to past pain and suffering

In seventeen prior SPU cases, the petitioner was awarded compensation for only actual or past pain and suffering in amounts below the median proffer figure discussed above, and in a range from $60,000.00 to $90,000.00.[30] These cases have all included

---

[30] These cases are: *Dagen v. Sec'y of Health & Human Servs.*, No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) (awarding $65,000.00 for actual pain and suffering and $2,080.14 for actual unreimbursable expenses); *Goring v. Sec'y of Health & Human Servs.*, No. 16-1458V, 2019 WL 6049009 (Fed. Cl. Spec. Mstr. Aug. 23, 2019) (awarding $75,000.00 for actual pain and suffering and $200.00 for actual unreimbursable expenses); *Lucarelli v. Sec'y of Health & Human Servs.*, No. 16-1721V, 2019 WL 5889235 (Fed. Cl. Spec. Mstr. Aug. 21, 2019) (awarding $80,000.00 for actual pain and suffering and $380.54 for actual unreimbursable expenses); *Kent v. Sec'y of Health & Human Servs.*, No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) (awarding $80,000.00 for actual pain and suffering and $2,564.78 to satisfy petitioner's Medicaid lien); *Capasso v. Sec'y Health & Human Servs.*, No.17-0014V, 2019 WL 5290524 (Fed. Cl. Spec. Mstr. July 10, 2019) (awarding $75,000.00 for actual pain and suffering and $190.00 for actual unreimbursable expenses); *Schandel v. Sec'y of Health & Human Servs.*, No. 16-0225V, 2019 WL 5260368 (Fed. Cl. Spec. Mstr. July 8, 2019) (awarding $85,000.00 for actual pain and suffering and $920.03 for actual unreimbursable expenses); *Bruegging v. Sec'y of Health & Human Servs.,* No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019) (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursable expenses); *Pruett v. Sec'y of Health & Human Servs.*, No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for actual pain and suffering and $944.63 for actual unreimbursable expenses); *Bordelon v. Sec'y of Health & Human Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (awarding $75,000.00 for actual pain and suffering); *Weber v. Sec'y of Health & Human Servs.*, No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for actual pain and suffering and $1,027.83 for actual unreimbursable expenses); *Garrett v. Sec'y of Health & Human Servs.*, No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019) (awarding $70,000.00 for actual pain and suffering); *Attig v. Sec'y of Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); *Dirksen v. Sec'y of Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Marino v. Sec'y of Health & Human Servs.,* No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-0224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr.

injuries with a "good" prognosis, although some of the petitioners asserted residual pain. All of the petitioners in such cases displayed only mild to moderate limitations in range of motion, and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. The duration of injury ranged from six to 29 months, with such petitioners averaging approximately fourteen months of pain.

Significant pain was reported in these cases for up to eight months. However, in approximately half of the cases, these petitioners subjectively rated their pain as six or below on a ten-point scale. Petitioners who reported pain in the upper end of the ten-point scale generally suffered pain at this level for three months or less. Slightly less than one-half of these individuals had been administered one to two cortisone injections. Most of these petitioners pursued physical therapy for two months or less, and none had any surgery. The petitioners in *Schandel, Garrett,* and *Weber* attended PT from almost four to five months, but most of the PT in *Weber* focused on conditions unrelated to the petitioner's SIRVA. Several of these cases (*Goring, Lucarelli, Kent, Knauss*, *Marino*, *Kim*, and *Dirksen*) included a delay in seeking treatment. These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

## ii. Above-median awards limited to past pain and suffering

In eight prior SPU cases, the petitioner was awarded compensation limited to past pain and suffering but above the median proffered SIRVA award, in ranges from $110,000.00 to $160,000.00.[31] Like those in the preceding group, the relevant petitioner's prognosis was "good," but these higher award cases were characterized either by a longer duration of injury or by the need for surgical repair. Thus, seven out of eight underwent some form of shoulder surgery, while one (*Cooper*) experienced two full years

---

Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses).

[31] These cases are: *Nute v. Sec'y of Health & Human Servs.*, No. 18-0140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $125,000.00 for pain and suffering); *Kelley v. Sec'y of Health & Human Servs.*, No. 17-2054V, 2019 WL 5555648 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (awarding $120,000.00 for pain and suffering and $4,289.05 in unreimbursable medical expenses); *Wallace v. Sec'y of Health & Human Servs.*, No. 16-1472V, 2019 WL 4458393 (Fed. Cl. Spec. Mstr. June 27, 2019) (awarding $125,000.00 for pain and suffering and $1,219.47 in unreimbursable medical expenses); *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); *Knudson v. Sec'y of Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Cooper v. Sec'y of Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Dobbins v. Sec'y of Health & Human Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Collado v. Sec'y of Health & Human Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses).

of pain and suffering, eight months of which were considered significant, and also required extended conservative treatment. On the whole, MRI imaging in these cases also showed more significant findings, with seven of eight showing possible evidence of partial tearing.[32] No MRI study was performed in the *Cooper* case.

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale, and all experienced moderate to severe limitations in range of motion. Moreover, these petitioners tended to seek treatment of their injuries more immediately (e.g., within five to 45 days from onset). Duration of physical therapy ranged from one to 28 months and six out of the eight had cortisone injections.

### iii. Awards including compensation for both past and future pain and suffering

In only three prior SPU SIRVA cases (all of which have been referenced in this case) has a petitioner been awarded compensation for *both* past and future pain and suffering.[33] In two (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain. The *Hooper* petitioner underwent surgery, while in *Binette* petitioner was deemed not a candidate for surgery following an arthrogram. Despite significant physical therapy (and surgery in *Hooper*), medical opinions indicated that the relevant petitioner's disability would be permanent. In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies.

---

[32] In *Reed*, MRI showed edema in the infraspinatus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head.  In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies.  In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus. In *Knudson*, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

[33] These cases are: *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); *Hooper v. Sec'y of Health & Human Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

In the third case (*Dhanoa*), the petitioner's injury was less severe than in *Hooper* or *Binette*. However, the petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis. These petitioners were awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded projected pain and suffering.

## VI.    Appropriate Compensation in this SIRVA Case

Petitioner acknowledges that the majority of her pain and suffering occurred during the year after vaccination and that she showed significant improvement post-surgery. The overall record shows Petitioner's SIRVA was much improved by the end of May 2017, approximately three months after surgery and less than eight months after vaccination. Indeed, by August 21, 2017, Petitioner exhibited few symptoms, and her post-surgical treatment ceased on September 15, 2017, eleven months after vaccination.

When Petitioner was seen by her new PCP five days later, she did not report any SIRVA symptoms. The only reference to Petitioner's shoulder injury was the inclusion of her March 2017 surgery under her history. There is no evidence of treatment from mid-September 2017 until early October 2019. When Petitioner returned to her orthopedist for a recheck of her right shoulder on October 2, 2019, she reported only occasional and mild symptoms. No medication or further treatment was prescribed.

### A.  Past Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of petitioner's injury.

### i.    Severity and Duration of Injury Prior to Surgery

The overall record in this case shows that, prior to vaccination, Petitioner suffered chronic back and hip pain and weakness in her lower extremities. Exhibit 2 at 5-20. She was prescribed extra strength Tylenol and Meloxicam which appeared sufficient to control her pain. While being treated for her SIRVA, Petitioner did not complain of pain in these other areas. It appears, however, that she continued taking Meloxicam and Tylenol. *See, e.g.* Exhibit 6 at 6.

Although she did not seek treatment for her SIRVA until approximately 60 days after vaccination, Petitioner explained that this delay was due to the death of a friend.

Exhibit 3 at 10. I also do not find a two-month delay in seeking treatment to be particularly suspicious or questionable. When Petitioner first sought treatment from her PCP on December 1, 2016, she described her condition as "very painful." Exhibit 2 at 3. An MRI performed on December 6, 2016 showed a partial rotator cuff tear and mild tendinosis but also mild osteoarthritis. Exhibit 4 at 1-2.

When seen by an orthopedist approximately two weeks later, Petitioner indicated that taking two Advil at night was not helping with her pain. Exhibit 6 at 5. At this visit, her active ROM was assessed at 140 degrees with pain at the extremes. *Id.* at 6. She was prescribed a prednisone taper and PT. It appears the prednisone alleviated approximately 50 percent of her pain for a few weeks at most. *Id.* at 2.

At her first PT session, Petitioner described her pain as aching, rating its level as between 3 to 7 on a scale of 10. Exhibit 7 at 69. Showing a slightly more limited ROM, Petitioner was assessed as having a 36 percent loss of functionality. Her ability to perform most daily tasks were ranked at 4 or 5 out of 10. *Id.* Petitioner continued to experience the same moderate to severe level of pain throughout the nine PT sessions she attended but her ROM continued to gradually decrease. *E.g., id.* at 57.

It is clear that, prior to her surgery, from the time she received the flu vaccine on October 17, 2016 until approximately five months later, Petitioner reported moderate to severe pain in her right shoulder, estimating the level of her pain somewhere between 3 to 8 on a scale of 10. A prednisone taper gave Petitioner a few weeks of temporary relief, but her pain returned shortly thereafter. Despite attending nine PT sessions from late December 2016 to early February 2017, Petitioner continued to experience a gradual reduction in her ROM.

I do not doubt Petitioner's condition resulted in the difficulties described in the affidavits from Petitioner, her daughter, and her husband during this time. Especially difficult for Petitioner was the additional stress this placed on her and her family as she attempted to maintain the consistency needed when caring for her twin sons, one of whom has been diagnosed with autism.

### ii.    Severity and Duration of Injury Following Surgery

When performing Petitioner's arthroscopic surgery on March 15, 2017, Dr. Bischoff observed that Petitioner's bursa was enlarged and bloody but saw no tears needing repair. He performed a bursectomy and used a shaver to debride Petitioner's bursa and other areas. Exhibit 3 at 13-14.

Approximately two days after her surgery at her first post-surgical PT session, Petitioner reported aching and intermittently sharp pain at a level of 0 to 9 out of 10. Exhibit 7 at 52. She had been instructed not to move her arm and her right shoulder ROM was recorded as 35 degrees for flexion and 25 degrees for abduction. In contrast, Petitioner exhibited left shoulder ROM of 150 and 130 degrees. *Id.* at 53. Five days later, her right shoulder ROM had improved to 100 degrees externally, with internal rotation of 40 degrees. Exhibit 3 at 4. At that orthopedic appointment on March 24, 2017, Petitioner indicated she was controlling her pain with over the counter medication. *Id.*

For the next two months, Petitioner attended 21 PT sessions. Exhibit 7 at 8-9, 21-23. By May 30, 2017, she was noted to be 60-70 percent improved. Her ROM had almost returned to normal. Her ability to perform all daily tasks was recorded as 8 out of 10. *Id.* at 21. At Petitioner's next orthopedic appointment, she reported that she was experiencing some aching but was otherwise good. It was noted that she had finished PT but would be attending WellFit sessions. Exhibit 3 at 16.

Petitioner attended approximately 24 Wellfit sessions from June to mid-September 2017. Exhibit 12 at 3-7. During this time, she was seen once more by her orthopedist, Dr. Bischoff. Exhibit 3 at 17. Exhibiting good ROM at this August 21, 2017 appointment, 160 degrees for external movement and 50 degrees for internal rotation, Petitioner reported further improvement over the last month. Petitioner's rotator cuff strength was noted to be 5- out of 5. *Id.*

The overall record shows that Petitioner's pain continued after her surgery but that she experienced significant improvement by the end of May 2017. Her improvement continued until September 2017 when she stopped attending even the WellFit exercise program. Any pain and suffering experienced by Petitioner after this point appears to be minimal. It certainly was not sufficient enough to require further medical care.

The affidavits from Petitioner's daughter and husband are consistent with this description. Both discuss difficulties during and immediately after Petitioner's surgery, including the need for Petitioner's husband to take time off from work during the week following Petitioner's surgery. Exhibit 14 at ¶ 4; Exhibit 15 at ¶ 5. Petitioner's husband also discusses the six-month period thereafter from early March to early September 2017. Neither alleges difficulties after that date. Exhibit 15 at ¶ 5.

### iii.   Comparison to Other Past Pain and Suffering SIRVA Awards

Overall, the circumstances in Petitioner's case are most like those experienced by the petitioner in the *Nute* case, in which the petitioner was awarded $125,000.00 for her past pain and suffering. 2019 WL 6125008, at *1, 12-13. Initially the *Nute* petitioner's pain

was severe, reported to be 8-10 on a scale of 10. After her second cortisone injection, performed two months after vaccination in mid-November 2016, the *Nute* petitioner obtained some relief. *Id.* at *2. However, her pain returned to the previous levels after approximately four months thereafter in March 2017. It stayed at that level until her surgery in June 2017. *Id.* at *3. Thus, the *Nute* petitioner suffered slightly more severe pain than that suffered by Ms. Rafferty in this case for a similar duration of time.

During the entire nine months before surgery, the petitioner in *Nute* suffered a significantly limited ROM, more than experienced by the Petitioner in this case. 2019 WL 6125008, at *12. For example, less than two months after vaccination, the *Nute* petitioner's external ROM had decreased from 60 to 30 degrees, and she was diagnosed with probable adhesive capsulitis. *Id.* at *1. In contrast, at that same point in time, Petitioner's ROM was assessed at 140 degrees. Exhibit 6 at 6. Additionally, the surgery undergone by the *Nute* petitioner was more extensive than the surgery undergone by Petitioner, as it included a biceps tenodesis.[34] 2019 WL 6125008, at *3.

Admittedly, however, many facts suggest the *Nute* petitioner's pain and suffering was somewhat less than that suffered by Petitioner. For example, the pain experienced by Petitioner prior to surgery was more consistent than that suffered by the petitioner in *Nute.* Petitioner obtained relief for only a few weeks from her prednisone taper. Additionally, the *Nute* petitioner experienced a much quicker recovery following surgery. She attended a similar amount of PT sessions (19) but in a more compact period of time (one month). 2019 WL 6125008, at *3-4. By one and one-half months after her surgery, the *Nute* petitioner had recovered from her SIRVA. *Id.* at *4.

Although the *Nute* petitioner, as an emergency room nurse, must have had difficulty performing her normal duties, her inability to perform certain work-related tasks is still not comparable to the difficulties Petitioner must have suffered while attempting to care for her children. As the primary caretaker for her sons, one of which has autism, she would have been impacted by her injury throughout the day. Additionally, her inability to explain her difficulties to her young sons would have compounded Petitioner's suffering. Thus, I find that the slightly greater severity of the *Nute* petitioner's symptoms prior to surgery is countered by her quicker recovery and slightly less difficult circumstances. I find the Petitioner in this case should be awarded slightly more than the petitioner in *Nute.*

I do not find, however, that relevant cited precedent supports an even higher award. Petitioner claims that her pain and suffering was greater than that of the petitioner in *Reed,* who suffered pain at levels of 6-9 out of 10 while attending more than 13 PT

---

[34] Tenodesis is "the stabilization of a joint by anchoring a tendon to a bone, done either surgically or through use of an orthosis." DORLAND'S at 1882.

sessions for the six months prior to her surgery and on a level of 3-6 out of 10 while attending 18 PT sessions for four months post-surgery. *Reed,* 2019 WL 1222925, at *3-9, 15. Four months after her surgery, the *Reed* petitioner was forced to seek treatment from a pain management specialist. *Id.* at *6-7. Two years after her injury, the *Reed* petitioner continues to take a strong opioid medication to manage her pain. *Id.* at *9, 11. Like the petitioner in this case, the *Reed* petitioner's son has autism. *Id.* at *10-11. The petitioner in *Reed* was awarded $160,000.00 for her past pain and suffering. *Id.* at *1, 18. But it is clear from the record that the severity and duration of Petitioner's pain and suffering was less than that suffered by the petitioner in *Reed.*

I agree there are multiple similarities between the facts in this case and those in *Selling* which is cited by Respondent in defense of a more modest pain and suffering award. However, there is one substantial difference, in that the Petitioner in this case underwent arthroscopic surgery during which several portals where created and debridement of multiple areas was performed. In contrast, the petitioner in *Selling* underwent only a manipulation. 2019 WL 3425224, at *2.

Respondent also cites multiple awards for shoulder injuries in the traditional tort system. Res. Brief at 7-8 (cases cited attached Appendix A). However, Respondent provides only a cursory amount of information regarding how these cases were chosen, some basic information about the type of injury suffered, but no information regarding the severity and duration of these injuries. Thus, I find they are not helpful when determining the appropriate amount of damages in this case. By contrast, SIRVA awards in the Vaccine Program are self-evidently more relevant and apposite, when viewed in light of Petitioner's specific circumstances.

### iv.  Amount of Award for Past Pain and Suffering

In determining Petitioner's entitlement award, I do not rely on a single decision or case. Rather, I have reviewed the particular facts and circumstances of her case, giving due consideration to the circumstances and damages in the cases cited by the parties and other relevant cases, as well as my knowledge and experience adjudicating SIRVA injury cases. For all the reasons discussed in this section, I find that **$127,500.00** represents a fair and appropriate amount of compensation for Petitioner's actual/past pain and suffering.

### B.  Projected/Future Pain and Suffering

In her second affidavit and damages brief, Petitioner maintains that she continues to suffer right shoulder pain which, although not constant, impacts her ability to complete certain tasks and care for her sons. Exhibit 16 at ¶ 1; Pet. Brief at 8. Asserting that her

pain will increase unless she routinely performs her prescribed PT exercises, Petitioner seems to argue that she has experienced pain since ceasing treatment in September 2017. Exhibit 16 at ¶¶ 1-2. In her brief, Petitioner asserts that she continued to suffer pain from vaccination to the present. Characterizing her improvement following surgery as "moderate" (Pet. Brief at 7), she states that her "residual shoulder pain is well beyond what she anticipated three and a half years post- vaccination" (*id.* at 8). By the end of her brief, Petitioner claims that she "suffered near constant pain for *over* two years . . . on a daily basis." *Id.* at 17 (emphasis in the original).

Petitioner's assertions, however, are not support by the record in this case. Even the affidavits provided by her daughter and husband do not allege Petitioner continued to experience right shoulder pain after September 2017. *See* Exhibits 14-15. There is no evidence, other than Petitioner's allegations, that she suffered pain or other symptoms during the two-year gap in treatment following her last WellFit visit in September 2017. Certainly, there is no evidence she sought medical treatment during this time.

When Petitioner was seen again by Dr. Bischoff on October 2, 2019, the visit is described as a recheck of her injury. Exhibit 13 at 1. At that visit, Petitioner reports only residual soreness and stiffness and some difficulties when she goes to the gym. *Id.* Dr. Bischoff does opine that Petitioner's stiffness and soreness is permanent and attributable to scar tissue from her right shoulder surgery but adds that further treatment is not warranted. *Id.* at 2. There is nothing in the record indicating Petitioner is taking or requires medication for her discomfort.

 Ms. Rafferty compares her current condition to that of the petitioners in *Hooper, Binette*, and *Curri*, arguing that she is entitled to more compensation for future pain and suffering than that awarded to the petitioners in *Binette* and *Curri* and the same as that awarded the petitioner in *Hooper*.  Pet. Brief at 14-18. It is important to stress, however, that the petitioner in *Hooper* was assessed as having a permanent disability of 50 percent, i.e. a permanent partial loss of functionality in his left arm. 2019 WL 1561519, at *9-10. In *Curri,* the petitioner's treating physician determined she suffered a permanent loss of left arm function in the amount of 22.5 percent. 2018 WL 6273562, at *2. And although the petitioner in *Binette* was not assessed as having a permanent loss of function, after extensive treatment she was told she was not a candidate for surgery and no further treatment was available to her. At that visit, she reported pain at a level of 5 out of 10. 2019 WL 1552620, at *2. She later testified that her pain remained constant at a level of 5 or higher. *Id.* at *13.

While I accept that Petitioner in this case will continue to experience some soreness and stiffness due to scar tissue from her surgery, her circumstances are not comparable to the petitioners who received compensation for future pain and suffering.

There is nothing to indicate the Petitioner in this case has or will suffer a loss of function like the petitioners in *Hooper* and *Curri,* or was suffering the constant levels of pain experienced by the petitioner in *Binette.* Dr. Bischoff does not refer to Petitioner's discomfort as pain, but only using terms like stiffness and soreness. And unlike the petitioner's treating physician in *Binette*, Dr. Bischoff does not indicate that further treatment is unavailable, but rather that he "do[es] not believe any further treatment is warranted." Exhibit 13 at 2.

I therefore find, in light of my review of the record as well as applicable prior SIRVA pain and suffering determinations, that Petitioner has not provided preponderant evidence to support an award for projected/future pain and suffering.

### C.  Actual Costs and Expenses

The parties agree that Petitioner is entitled to reimbursement of expenses in the amount of $4,154.04. Additionally, Petitioner has filed supporting documentation regarding these out-of-pocket expenses. Exhibit 17. I have reviewed this documentation and agree that Petitioner is entitled to the full amount of compensation sought for these past, out of pocket expenses.

### VII.   Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $127,500.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[35] I also find that Petitioner is entitled to $4,154.04 for her actual out-of-pocket costs. I find that an award for projected pain and suffering is not warranted in this case.**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $131,654.04, representing compensation in the amount of $127,500.00 for Petitioner's past pain and suffering and in the amount of $4,154.04 for Petitioner's actual expenses in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

---

[35] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required.  *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

The clerk of the court is directed to enter judgment in accordance with this decision.[36]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[36] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.